**EXHIBIT A**

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS<br>FIFTH JUDICIAL CIRCUIT |
| COUNTY OF RICHLAND | |
| Lucrecia Greenwood,<br>Plaintiff,<br>v.<br>Cross Country Mortgage, LLC d/b/a Palmetto Mortgage Group,<br>Defendant. | **SUMMONS** |

TO THE DEFENDANT ABOVE NAMED:

YOU ARE HEREBY SUMMONED and required to answer the Complaint herein, a copy of which is served upon you, and to serve a copy of your answer to this Complaint upon the subscriber at the address shown below within thirty (30) days (thirty five (35) days if served by United States Mail) after service hereof, exclusive of the date of such service, and if you fail to answer the Complaint, judgment by default will be rendered against you for the relief demanded in the Complaint.

**CROMER BABB & PORTER, LLC**

BY: s/Shannon Polvi
Shannon Polvi (#101837)
1418 Laurel Street, Suite A (29201)
Post Office Box 11675
Columbia, South Carolina 29211
Phone 803-799-9530
Fax 803-799-9533
***Attorney for Plaintiff***

May 14, 2025
Columbia, South Carolina

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br><br>COUNTY OF RICHLAND<br><br>Lucrecia Greenwood,<br><br>Plaintiff,<br><br>v.<br><br>Cross Country Mortgage, LLC d/b/a Palmetto Mortgage Group,<br><br>Defendant. | IN THE COURT OF COMMON PLEAS<br>FIFTH JUDICIAL CIRCUIT<br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

**EMPLOYMENT CASE**

Plaintiff, complaining of Defendant herein, would respectfully allege as follows:

**PARTIES & JURISDICTION**

1. Plaintiff, Lucrecia Greenwood, ("Plaintiff") is a citizen and resident of Richland County, South Carolina.

2. Defendant, Cross County Mortgage, LLCd/b/a Palmetto Mortgage Group, ("Defendant") is a limited liability corporation operating in South Carolina.

3. This action arises under Title VII of the 1964 Civil Rights Act, and amendments thereto ("Title VII"), the Americans with Disabilities Act and amendments thereto ("ADA"), the Pregnancy Discrimination Act and amendments thereto ("PDA"), and the Family Medical Leave Act and amendments thereto ("FMLA").

4. Plaintiff filed charges with the United States Equal Employment Opportunity Commission and the South Carolina Human Affairs Commission, received her Notice of Right to Sue, and this action is timely filed.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

5. Defendant employed Plaintiff in South Carolina wherein she worked in several counties, including Richland County and the majority of the acts giving rise to this action occurred in Richland County.

**FACTUAL ALLEGATIONS**

6. Plaintiff began employment with Cross Country Mortgage's predecessor, Residential Finance, on October 10, 2012, as Brian Prahl's loan assistant.

7. Around June 2018, Plaintiff was promoted to Operations Manager.

8. Defendant's sales and loan officer staff was mostly comprised of friends of Brian Prahl ("Prahl) from college or locally, most of whom did not have any experience in the mortgage industry. This created a type of "frat house" environment where lines of professionalism were often blurred. It was not uncommon to be outside on the deck during working hours having some beers or meeting for happy hours. As time went on, what was once fun became a very toxic and hostile work environment.

9. In March 2020, all of Defendant's employees became remote workers due to the Covid-19 pandemic.

10. During this time, low interest rates created a huge refinance surge and homebuying frenzy, making this the busiest time for Palmetto Mortgage Group ("PMG"). Many new employees were hired during this time.

11. Prahl, Tripp Davis ("Davis"), and a few other salespeople returned to the office a couple of months later. Prahl and Plaintiff decided that operations would remain remote, possibly permanently, since things seemed to be running smoothly during this time.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

12. Separation of operations and sales was positive at that time because it created a barrier for several of the sexism and harassment issues occurring in the workplace. There were still complaints during that time, but such complaints were less egregious due to less in-person work.

13. Also, during this time, the new PMG building was under construction. It is located at 925 E. Main St., Lexington, SC.

14. Between 2021 and 2022, many operations employees were required to return to the office. There was no equality as far as who would be back. This caused more accusations of sexism, harassment, and racism.

15. Defendant's Greenville Branch, which accounted for about 40–45% of the company's regional income, was planning on leaving for another company. As a result, Defendant's employees, including Plaintiff, were under high stress to keep the Greenville Branch from leaving. The last time a branch decided to leave, it was very openly negotiated with Prahl.

16. Plaintiff was consistently compelled to participate in recruitment and appeasement efforts in these situations, leading her to feel that her achievements were not based on her expertise, but rather on her appearance being leveraged in these contexts. In one meeting about the Greenville Branch, attended by the Plaintiff, Jon Adams, Greg Bailey, Prahl, and Jaime Mullen, Plaintiff was sitting next to Prahl and needed to use the bathroom. Plaintiff asked Prahl to get up so she could slide out of the booth. When she stood up, Prahl slapped Plaintiff on the butt right in front of everyone at the table.

17. Plaintiff felt intentionally disrespected and degraded by this action and almost cried in the bathroom. Jaime Mullen checked up on Plaintiff afterwards.

18. Plaintiff had previous and subsequent similar experiences with Prahl. Out of fear of losing her job if she stood up for herself, Plaintiff typically accepted Prahl's apologies the next

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

day. The unwanted sexual touching occurred in settings outside of the office and where drinking was involved.

19. On a separate occasion, Plaintiff and Prahl took some of the Greenville Branch loan officers out for dinner and drinks after the loan officers had visited Lexington. Once again, after some drinks, Prahl engaged in unwanted sexual touching of Plaintiff. To avoid the unwanted contact, Plaintiff decided to remove herself from the situation and had a friend come pick her up.

20. As she was leaving, in front of Michael Saxon, Fallon Hill, and a few others, Prahl smacked Plaintiff on the butt and offensively and clearly stated to all those present, "that's my bitch." Plaintiff was humiliated.

21. Prahl then followed Plaintiff outside, where Plaintiff's friend was sitting in his car. Prahl walked up to his window and then Prahl yelled, "What's up motherfucker?" Plaintiff was flabbergasted, and said to her friend, "That's my boss. Let's just go, please." They left.

22. The next morning, Plaintiff walked straight into Prahl's office and closed the door. She was scared and frustrated, thinking she was about to lose her job, but she could not let the harassment continue.

23. Plaintiff told Prahl how horrible she felt about the harassment and that Prahl had disrespected her friend. Plaintiff explained that because their own boss, Prahl, did not respect Plaintiff, other male salespeople in the office did not respect anyone either.

24. Plaintiff asked if Prahl could remember any situation where she had disrespected his friends, wife, or family, and he stated that had never happened. Although Prahl apologized, it was a very tense situation after this conversation.

25. In February 2022, everyone employed by PMG received an email from marketing employee Lauren Beers, welcoming a new Operations Manager, which was Plaintiff's position.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

Plaintiff received many phone and email messages asking if she had been fired. Plaintiff was confused and immediately reached out to Prahl. He claimed the email was a mistake and that Charles Pulliam was only a loan officer. No follow-up email correcting the mistake was sent, which Plaintiff found odd.

26. On April 25, 2022, all employees of PMG became employees of Cross County Mortgage ("CCM").

27. In May 2022, Plaintiff was approached by a female employee who was scared to talk about how she had been sexually harassed by Jason Burns ("Burns"), a loan officer that she processed for.

28. Burns had threatened to come to the female employee's house, was calling her "babe" in text messages, and continued asking her to lunch or dinner because he had some presents for her. Burns would call the female employee after hours and it seemed that he was inebriated many of these times. Most of these calls were not work related.

29. Plaintiff told the female employee that she did not have to answer Burns' offensive communications or any contacts after hours. She was afraid that if she did not answer Burns' communications, he would tell Davis and Prahl that she was not doing her job and she would be fired.

30. At one point, the female employee talked to Burns, and he told her that she never had to worry about a job because he owned many ATM machines in strip clubs in South Carolina and he would get her a job. Burns went on to tell her that there was a niche for her body type and that she could even find a different position at the strip club.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

31. Upon learning this information, Plaintiff reported Burns to Prahl and Davis, who initially seemed genuinely concerned. Plaintiff was told that Prahl reached out to the company's human resources department about it but was not present for the conversation.

32. The female employee wanted to remain anonymous because she was afraid that if other loan officers knew, nobody would want to work with her. Defendant's human resources department stated that they could not get involved if she was not willing to come forward without anonymity. After this, human resources dealt with Deanna directly.

33. Prahl and Davis asked Plaintiff to set up a meeting with the female employee in person at the Lexington office. Plaintiff was not asked to be there, but she came because the female employee wanted another woman in the office with her.

34. Prahl and Davis asked the female employee to repeat what she had said to Plaintiff. She complied and they then asked to see her text messages. She showed text messages screenshots of the harassment to both Davis and Prahl, who both seemed very shocked and implied that Burns would be terminated due to his behavior.

35. A few days later, after talking to Burns, Prahl and Davis decided that Burns had no ill intent and would continue to work at PMG. Plaintiff was very upset by this lack of accountability for Burns even though the sexual harassment complaint was substantiated.

36. Prahl told the female employee that Burns would not be let go and she then reached out to Plaintiff in shock. The female employee was told by Prahl that he and Davis did not feel they could make such a drastic call but instead wrote Burns up for his behavior. Plaintiff is not aware if any discipline was actually ever issued to Burns.

37. Prahl made excuses for Burns' unlawful sexual harassment. Prahl told Plaintiff that he felt bad for Burns.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

38. Burns continued to work for Defendant and was given a different female processor.

39. That day , Plaintiff received a call from the different female processor who was very upset, as she was aware that Burns had sexually harassed his prior female processor.

40. The female employee who complained about Burns reported that she suffered panic attacks and hospitalization due to the hostile work environment.

41. She was told that she did not have to come to the office if she was afraid to run into Burns, but that Burns was not going to be told to not show up to events or any in person meetings.

42. Plaintiff continued to oppose Defendant's treatment of the sexual harassment complainant, who she believes was being penalized in retaliation for reporting sexual harassment.

43. A gay male employee was hired during this time and he experienced sexual harassment and harassment due to his sexual orientation. Plaintiff opposed the sexual harassment this male experienced that included Michael Saxon showing him pictures of naked women and telling him about his sexual encounters with women during work meetings. When Plaintiff reported this sexual harassment to Prahl, the sexual harassment complainant was reassigned to a different loan officer, and he felt he was the one penalized for coming forward.

44. In June 2022, Plaintiff sent an email to Prahl because he had yelled at Plaintiff about reporting these instances of sexual harassment and harassment. Plaintiff's email stated that this all had taken a toll on her and that she feared for her job if she came forward with other employees reporting misconduct. Prahl threatened Plaintiff's job on more than one occasion because she continued to report unlawful conduct in the workplace, was witness to so many of these actions, and was a victim herself.

45. Prahl did read Plaintiff's email because he acknowledged that he "heard" Plaintiff, but he never substantively responded to Plaintiff's email.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

46. Shortly after this, in retaliation for Plaintiff's protected activities, Plaintiff lost her monthly bonus, which was a substantial amount. The retaliatory reduction in Plaintiff's pay took effect in July 2022.

47. Plaintiff received no warning of her salary decrease and felt this was a clear message for her to stop acknowledging and reporting all the violations and misconduct.

48. The work relationship between Prahl, Davis, and Plaintiff was obviously damaged at this point. Plaintiff began to be left out of important meetings and decisions, but then she was blamed when certain things went wrong despite her having no knowledge of or anything to do with them. Plaintiff was on alert and afraid of being inaccurately blamed for things.

49. During this time another female employee, came forward and stated that Burns had made similar unwanted sexual passes at her. When Prahl found out, he again made excuses for Burns and told Plaintiff that the female employee had "been out drinking with the guys" and had said some very offensive statements which involved sexual acts with her husband.

50. Plaintiff felt like no matter what an operations staff member said that a salesperson did about sexual harassment, Prahl would discredit the reporter and make it seem like it was the reporter's fault.

51. PMG's acquisition by CCM created even more tension in the office and the region.

52. Since the company had to change systems, a lot of previously unavailable information about PMG became available to Plaintiff. LendUS, the CCM predecessor Plaintiff worked with, was very small compared to CCM. Prahl, who holds the title of Regional President, and Matt Yaccabozzi, EVP of Retail Lending, had a lot of control.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

53. After the acquisition, Plaintiff became aware of several matters that prompted her to report concerns that arise under OSHA regulation and that matter is separately pending before an Administrative Law Judge.

54. Plaintiff talked with Prahl about Michael Saxon's continued harassing behavior toward women in the office. Upon information and belief, no discipline was issued to Michael Saxon.

55. After meeting with Prahl in October 2022, wherein Plaintiff engaged in protected activities, Plaintiff's salary was cut by $24,000. Plaintiff perceived that if she came forward to Prahl or Davis about any violations, they would continue to cut her pay or worse. Plaintiff felt deflated, shocked to be treated in this way, and afraid that she would be blamed for others' wrongdoings.

56. In November 2022, shortly before Plaintiff was terminated, Plaintiff was in her office at the Lexington Branch. Another female processor at that branch came to Plaintiff's office to discuss Michael Saxon's treatment of a female client.

57. Davis happened to walk by Plaintiff's office as the female was reporting her concerns about Michael Saxon, so Plaintiff waived Davis to come in. Plaintiff felt bad about putting the female employee on the spot but Plaintiff felt that if she went to Davis or Prahl with the report, they would make Plaintiff feel like she had embellished it, or made it up all together, or that she would be terminated in retaliation.

58. Plaintiff asked her to start from the beginning and tell Davis what had occurred. The female employee reiterated the incident and ended the conversation by letting Davis and Plaintiff that she and the teacher were so upset.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

59. Operations was being asked to help refer friends and family to drum up more business, but clients were being treated disparately based on sex. This was not the first time a female client had complained about Michael Saxon.

60. Davis said that he would handle the situation and thanked the female employee for coming forward. He stayed in Plaintiff's office, closed the door, and then stated that he would have his assistant reach out to the client since his assistant was really good at dealing with single moms. The comment made Plaintiff upset.

61. Plaintiff reported her concerns to Davis along with the financial information that she had come across and the fact that they were covering up so many violations. Davis was fixated on telling Plaintiff that he had cut his salary for the better good of the company. Tripp also expressed that what upset him the most was that Plaintiff stated that she didn't believe him. Tripp Davis' mindset is evidenced by him slamming the door when he left Plaintiff's office.

62. A couple of days later, Plaintiff was leaving for the day around 5pm and went to say bye to Prahl. In passing, Plaintiff peaked in Davis' door to say bye. In a genuine effort to try to smooth things over so they could move forward, Plaintiff said to Davis, "I still love ya." In response, Davis asked if Plaintiff could talk briefly, and she said she was pressed on time since she had to go across town to pick up her daughters. Davis quickly stated that he did not think that he could forgive Plaintiff for implying that he was a liar and he may not be able to move past it. Plaintiff was shocked and stated that she found it hard to understand how he could forgive sexual harassment, industry violations and much more, but was so impacted by her statement.

63. Tripp stood up from his desk and demanded that Plaintiff "get the fuck out of the office." Plaintiff was frightened and left.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

64. Prahl's office was next door to Davis' office and Prahl was walking by when Plaintiff was leaving, so she knew he heard what was said in Davis' office.

65. While Plaintiff was driving, Davis text messaged her that he wanted to talk to her. Plaintiff text messaged Prahl later that evening to see if she still had a job. Prahl knew somewhat of what had occurred and they were both focusing on Davis' pay, which was not the focus of Plaintiff's conversation with Davis. Plaintiff's focus was about Equal Lending, RESPA and the hostile work environment of sexual harassment and harassment occurring in the workplace.

66. Plaintiff then decided to involve corporate. She knew she could not handle all of this alone and she was afraid for her job and the jobs of those she had defended.

67. Karina Romero ("Romero") was a female employee who had been mistreated extensively. Most of Romero's mistreatment occurred during the COVID-19 pandemic, so Plaintiff was not personally a witness to it, but once employees returned to the office, it was obvious to Plaintiff.

68. Romero had been hired with the promise of being trained to become a loan assistant and ultimately a loan officer. Later, Plaintiff promoted Romero and began to train her to help with overflow or when someone was out sick. This made Davis and Prahl very upset, even though Plaintiff's job was to train and help with operations.

69. Romero told Plaintiff that she had been discriminated against and that she had also been sexually harassed. Romero expressed that she really needed the job, so she was just trying to go with the flow. Romero was terminated on the same day as Plaintiff.

70. When Plaintiff spoke to human resources and the Chief Compliance Officer, before either termination occurred, that was the first time Plaintiff had mentioned Romero's reported issues. Plaintiff had not told Davis or Prahl because, given what had happened to Plaintiff and to

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

the prior complainants described above, Plaintiff knew Romero would be penalized and Plaintiff would be retaliated against.

71. Plaintiff contemplated leaving for another company because of the incidents summarized above and was open with Davis and Prahl about it.

72. After telling Prahl about considering leaving, Plaintiff came into the office one morning to find a handwritten card from Prahl stating, "I love you, also you are never leaving." Plaintiff did not know what to make of the card but felt it seemed passively threatening. Plaintiff was unsure how to respond.

73. Plaintiff decided to stay with the company but knew that changes were needed in the workplace to comply with several laws.

74. On November 9, 2022, Plaintiff reached out to Matt Yaccabozzi ("Yaccabozzi") for advice, after a conversation with Prahl via text message. Plaintiff had told Prahl how bad the work environment had become and asked if bringing Yaccabozzi into the situation would help ease some of the tension. Yaccabozzi was away on a business trip, so they were unable to connect until a couple of days later.

75. On November 11, 2022, Plaintiff had a call with Yaccabozzi and mostly discussed the work environment and how it was affecting many employees. Plaintiff let Yaccabozzi know that Prahl and Davis had been made aware of many situations involving misconduct and violations, but Plaintiff did not feel that any of it was taken seriously. Yaccabozzi advised Plaintiff to reach out to human resources and go into more detail about the allegations of misconduct and other violations. However, Yaccabozzi also advised caution in what actions Plaintiff should take.

76. Yaccabozzi offered Plaintiff the opportunity to open a branch in Columbia, South Carolina, and work directly for him, no longer as part of Palmetto Mortgage Group. He also offered

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

alternatively for Plaintiff to become a loan officer for Prahl, or to stay in her current position. Plaintiff felt that Matt was pushing her toward either leaving the company or working under him at a separate branch.

77. Plaintiff mentioned to Yaccabozzi that there was a concern that her cancer had returned, based on current symptoms. Plaintiff is a survivor of Synovial Sarcoma, having been diagnosed while already employed with Prahl, under a predecessor company, Residential Finance.

78. Plaintiff expressed fear because of having previously been discharged while on FMLA, as a reasonable accommodation for cancer, around the time Residential Finance filed for bankruptcy. Since that time, Plaintiff had kept quiet about medical symptoms out of fear of termination, especially after beginning to report misconduct and violations. Plaintiff also told Yaccabozzi about being worried about workplace rumors, as people had seen Plaintiff vomiting in the bathroom. Plaintiff also shared her concern that if her cancer was back she would lose her job as a result.

79. On the same day, November 11, 2022, just minutes after the call with Yaccabozzi, Plaintiff received a call from Prahl, who was extremely angry about the conversation with Yaccabozzi. Plaintiff immediately messaged Yaccabozzi to inform him, having already expressed concern that Prahl would not be supportive of Plaintiff running a separate branch.

80. On that call with Prahl, Plaintiff disclosed cancer-related health concerns and also shared the shocking news of a positive pregnancy test. Plaintiff previously been told she could not get pregnant after her cancer diagnosis. Prahl asked what that meant for Plaintiff's health and work situation. Plaintiff replied that she was unsure but that she would need time off.

81. Plaintiff immediately regretted telling Prahl of her pregnancy, since Brook Glen and Alexis Rice had recently been terminated for being pregnant.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

82. Plaintiff then contacted corporate human resources and corporate compliance, beginning email correspondence with representatives from both divisions.

83. On Thursday, November 17, 2022, Plaintiff had a roughly 2.5-hour meeting with three human resources representatives and corporate compliance. Plaintiff engaged in Title VII and other statutorily protected activities during that meeting.

84. On Friday, November 18, 2022, at 9:29 a.m., Plaintiff received an email from Brittney Scherma that included the following statement: "Per our conversation, we are addressing these concerns and we are in the process of investigating. For security purposes, during the investigation we have temporarily disabled your access and you will be paid throughout the investigation." This shows that less than 24 hours after Plaintiff engaged in protected activities, and within a few business hours, Plaintiff was locked out of the company's computer system.

85. On Monday, November 21, 2022, the company immediately closed any purported investigation into Plaintiff's report to corporate. An email time-stamped 2:45 p.m. notified Plaintiff of the closure.

86. A subsequent email at 4:55 p.m. that same day, November 21, 2022, informed Plaintiff of her termination. The first paragraph of the Letter of Separation stated Defendant's pretextual reason for eliminating Plaintiff's job through a reduction in force.

87. On December 8, 2022, Plaintiff required emergency surgery for an ectopic pregnancy and ruptured fallopian tube, which caused extreme pain. Since she had lost her job, Plaintiff no longer had health insurance, and medical bills quickly piled up. Plaintiff experienced emotional and physical distress and was unable to access medical attention earlier due to financial limitations.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

**FOR A FIRST CAUSE OF ACTION**
**(Sex Discrimination in Violation of Title VII)**

88. Where not inconsistent herewith, Plaintiff realleges the foregoing paragraphs.

89. Plaintiff is a female, and a former employee of Defendant.

90. Plaintiff was sexually harassed by her direct supervisor, Brian Prahl. Plaintiff also received complaints from multiple employees of sexual harassment by other male employees, including Jason Burns and Michael Saxon.

91. Plaintiff reported sexual harassment by her direct supervisor to Defendant. Plaintiff also reported sexual harassment of other employees by Jason Burns and Michael Saxon to Defendant.

92. Plaintiff was terminated.

93. Plaintiff performed her job aptly and the stated basis for her termination is pretext.

94. Defendant had knowledge of Prahl's sexual harassment of Plaintiff and Burns's and Saxon's sexual harassment of other employees. The harassment and Defendant's termination was based on sex and Defendant's conduct toward Plaintiff was willful and wanton.

95. Defendant is liable for the sexual harassment and termination that violated Plaintiff's rights protected by Title VII of the Civil Rights Act and has directly and proximately caused her damages including: reinstatement, loss of salary and benefits, back pay, front pay, retirement and other benefits, compensatory damages, as well as reputational loss, physical, mental and emotional suffering. Further, Defendant's conduct was willful and wanton, and Plaintiff is entitled to punitive damages for the same. Plaintiff also requests pre-judgment interest, tax offset for a lump sum award, equitable relief, and attorney's fees and costs of this action.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

**FOR A SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**

96. Where not inconsistent herewith, Plaintiff realleges the foregoing paragraphs.

97. Plaintiff engaged in protected activity when she complained that she was being sexually harassed by Brian Prahl and that other employees, including Jason Burns and Michael Saxon, were sexually harassing other female employees of Defendant.

98. Plaintiff had a positive record of employment with Defendant prior to her sexual harassment complaints.

99. Following her protected activities throughout May and June of 2022 in reporting sexual harassment allegations from other female employees, Defendant retaliated against Plaintiff because of her protected activity by terminating her monthly bonus.

100. Following her protected activities in October 2022 in meeting with Brian Prahl about other employees' harassment complaints, Defendant retaliated against Plaintiff because of her protected activity by reducing her salary.

101. Following her protected activities on November 17, 2022, Defendant retaliated against Plaintiff because of her protected activity by terminating her employment.

102. Defendant's conduct constitutes unlawful retaliation in violation of protected activities outlined in Title VII of the Civil Rights of 1964, for which it is liable.

103. For the retaliation alleged, Defendant is liable to Plaintiff for: reinstatement, loss of salary and benefits, back pay, front pay, retirement and other benefits, compensatory damages, as well as reputational loss, physical, mental and emotional suffering. Further, Defendant's conduct was willful and wanton, and Plaintiff is entitled to punitive damages for the same. Plaintiff also requests pre-judgment interest, tax offset for a lump sum award, equitable relief, and attorney's fees and costs of this action.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

**FOR A THIRD CAUSE OF ACTION**
**(Disability Discrimination in Violation of the ADA)**

104. Where not inconsistent herewith, Plaintiff realleges the foregoing paragraphs.

105. During her employment by Defendant, Plaintiff developed synovial sarcoma (cancer) and also became pregnant. Due to her history of cancer, Plaintiff's pregnancy was high-risk. Plaintiff's high risk pregnancy conditions and cancer are cognizable disabilities under the ADA.

106. Defendant was on notice of Plaintiff's disabilities. Defendant perceived Plaintiff as disabled.

107. During employment, in close temporal proximity to the human resources investigation into Plaintiff's discrimination reports and Plaintiff's termination, Plaintiff disclosed her disability to Matt Yaccabozzi and Brian Prahl and how it may impact her employment.

108. Plaintiff is, and was at all times relevant hereto, qualified and able to do her job.

109. Defendant terminated Plaintiff's employment because of her disability which is an unlawful violation of the ADA for which Defendant is liable.

110. Shortly after her termination, Plaintiff was treated for ectopic pregnancy caused by her cancer, which is an emergency situation, and incurred a large amount of medical expenses due to losing her insurance.

111. As a direct and proximate result of the violations of her civil rights under the ADA by Defendant, Plaintiff suffered actual damages in the form of lost wages and benefits, tax offset for lump sum wage payment, and compensatory and other intangible damages, including the loss of her earning capacity, physical, mental and emotional suffering. Plaintiff is entitled to reinstatement, pre-judgment interest, equitable relief, and reasonable attorney's fees and costs of this cause of action.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

**FOR A FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of the ADA)**

112. Where not inconsistent herewith, Plaintiff realleges the foregoing paragraphs.

113. Plaintiff engaged in activities protected under the ADA by Plaintiff disclosing her disability and stating her need for time off when Plaintiff spoke with Matt Yaccabozzi about her cancer and with Brian Prahl about her high risk pregnancy conditions and cancer.

114. Defendant was on notice of Plaintiff's ADA protected activities.

115. Defendant unlawfully terminated Plaintiff in violation of the Anti-Retaliation provisions of the ADA.

116. Defendant terminated Plaintiff because of her ADA protected activities.

117. Defendant caused Plaintiff damages that she is entitled to recover as a result of the same, including actual damages in the form of lost wages and benefits, tax offset for lump sum wage payment, and compensatory and other intangible damages, including physical, mental and emotional suffering. Plaintiff is entitled to reinstatement, pre-judgment interest, equitable relief, and reasonable attorney's fees and costs of this cause of action.

**FOR A FIFTH CAUSE OF ACTION**
**(Violation of the PDA, an amendment to Title VII)**

118. Where not inconsistent herewith, Plaintiff realleges the foregoing paragraphs.

119. Plaintiff is a female. During her employment with Defendant, Plaintiff became pregnant. Plaintiff communicated her need for some time off to accommodate her pregnancy.

120. Defendant terminated Plaintiff shortly after learning of her pregnancy.

121. Defendant's conduct violated the PDA. The cause of Defendant's termination of Plaintiff was her pregnancy. Defendant's actions were willful.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

122. Defendant directly and proximately caused and is liable for the damages incurred by Plaintiff as a result of its pregnancy discrimination. Those damages include: reinstatement, lost income, back pay, front pay, lost benefits, reputational harm, embarrassment, humiliation, diminished earning capacity and pain and suffering. Plaintiff is also entitled to consequential and punitive damages for the intentional and wrongful conduct described hereinabove. Plaintiff is further entitled to attorney's fees, costs, tax offset for lump sum wage payment, equitable relief, and pre-judgment interest on all damages awarded.

**FOR A SIXTH CAUSE OF ACTION**
**(FMLA – Interference)**

123. Where not inconsistent herewith, Plaintiff realleges the foregoing paragraphs.

124. Plaintiff is an eligible employee as defined by the FMLA and Defendant is an employer as defined by the FMLA.

125. The FMLA interference provisions under 29 U.S.C.A § 2615(a)(1) make it unlawful for any employer to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided by the FMLA.

126. Plaintiff needed medical leave because of high risk pregnancy, and Defendant was on notice of Plaintiff's serious health condition and the foreseeable need for Plaintiff to need medical leave time from work.

127. Defendant unlawfully interfered with Plaintiff's exercise and attempts to exercise her rights under the FMLA.

128. In violation of the FMLA, Defendant failed to provide written notice to Plaintiff that her absence qualifies under the FMLA as required by 29 C.F.R. § 825.300.

129. Defendant failed to issue Plaintiff a "rights and responsibilities notice" required by 29 C.F.R. § 825.300(c).

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

130. Defendant failed to issue Plaintiff a "designation notice" required by 29 C.F.R. § 825.300(d).

131. Defendant's interference of Plaintiff's FMLA rights was willful and wanton.

132. These failures of Defendant prejudiced Plaintiff's rights and caused her harm.

133. As a direct result and consequence of the willful violation of the FMLA by Defendant, Plaintiff lost her job. Plaintiff suffered actual damages in the form of lost wages and benefits and compensatory and other intangible damages, including the loss of her earning capacity, pain and suffering, and emotional distress. Plaintiff is entitled to an award of liquidated damages for the willful and intentional acts of Defendant through its agents and employees, for pre and post judgement interest, tax offset for a lump sum award, equitable relief, attorney's fees, and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendant for reinstatement, lost income, back pay, front pay, future earnings, benefits, reputational loss, pain and suffering and other actual and compensatory damages in an amount to be determined by a jury as well as an award of liquidated damages and punitive damages of the willful, intentional, and malicious treatment given to her. Plaintiff is entitled to any equitable, actual, compensatory, liquidated, and punitive damages for the discrimination alleged in this action. Plaintiff last prays for attorney's fees and for costs, tax offset for lump sum wage payment, any such other relief as the Court may deem just and proper, and pre-judgment interest on all damages.

ELECTRONICALLY FILED - 2025 May 14 3:08 PM - RICHLAND - COMMON PLEAS - CASE#2025CP4003431

CROMER BABB & PORTER, LLC

BY: s/Shannon Polvi
Shannon Polvi (SC Bar #101837)
1418 Laurel Street, Suite A (29201)
Post Office Box 11675
Columbia, South Carolina 29211
Phone 803-799-9530
Fax 803-799-9533
*Attorney for Plaintiff*

May 14, 2025
Columbia, South Carolina